# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| THE ESTATE OF BARBARA WASHINGTON, by its Executrix VENUS SPRINGS; VENUS SPRINGS, Individually; and TAMMY FOSTER, Individually,<br><br>Plaintiffs,<br><br>v.<br><br>NOVANT HEALTH, INC.; THE PRESBYTERIAN HOSPITAL d/b/a NOVANT HEALTH PRESBYTERIAN MEDICAL CENTER; NOVANT HEALTH MATTHEWS MEDICAL CENTER, LLC d/b/a NOVANT HEALTH MATTHEWS MEDICAL CENTER (f/k/a Presbyterian Medical Care Corp.); OLIVER W. JERVIS, JR., M.D.; and TOM P. THERUVATH, M.D.,<br><br>Defendants. | Civil Action No.: 3:26-cv-409<br><br><br>**VERIFIED COMPLAINT**<br>**(Jury Trial Demanded)** |

COMES NOW Plaintiffs, the Estate of Barbara Washington ("Washington"), Venus Springs, and Tammy Foster (collectively, "Plaintiffs"), complaining of Defendants, and allege as follows:

## INTRODUCTION

1. This is a wrongful death and civil rights action arising from the death of Barbara Washington, an 82-year-old disabled woman, who died at Novant Health Presbyterian Medical Center on May 23, 2024, after Defendants denied her life-saving surgical treatment, subjected her to prolonged conscious suffering, and treated her as unworthy of care because she was an older person who walked with a cane. Ms. Washington arrived at

1

Novant Health Matthews Medical Center by ambulance in the early morning hours of May 22, 2024, suffering an aortic dissection. She was revived after cardiac arrest en route, transferred to Novant Health Presbyterian Medical Center, regained full consciousness, and was then systematically denied surgery, pain relief, and basic dignity until she died the following morning.

2. Even as Ms. Washington lay dying, Novant Health billed Medicare for services the records show it never intended to provide -- charging the federal government for expensive equipment evaluating Ms. Washington's candidacy for surgery that both doctors had already written off in her chart. The decision to deny her life-saving surgery was documented in her medical record on the basis of her use of a cane and walker, in violation of Section 504 of the Rehabilitation Act and Section 1557 of the Patient Protection and Affordable Care Act.

### JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), arising under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116.

4. This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the federal claims and arise from a common nucleus of operative facts.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, specifically at Novant Health Presbyterian Medical Center in Charlotte, North Carolina, and at Novant Health Matthews Medical Center in Matthews, North Carolina, both located in Mecklenburg County within the Charlotte Division of the Western District of North Carolina.

2

6. This Court has personal jurisdiction over all Defendants because each Defendant is a citizen of North Carolina or maintains a principal place of business in North Carolina, and each Defendant conducts substantial and continuous business within this District.

## THE PARTIES

7. The Estate of Barbara Washington is a North Carolina estate, administered by its duly appointed Executrix, Venus Springs. Ms. Washington was a resident of Mecklenburg County, North Carolina, and was an older adult as defined by North Carolina law at the time of her death.

8. Venus Springs is a resident of Charlotte, North Carolina, and the daughter of Barbara Washington. Venus Springs is also the Executrix of the Estate of Barbara Washington.

9. Tammy Foster is a resident of Charlotte, North Carolina, and the daughter of Barbara Washington.

10. Defendant Novant Health, Inc. is a North Carolina non-profit corporation formerly known as Presbyterian Health Services Corp., with SOSID 0116543 and a principal office at 2085 Frontis Plaza Boulevard, Winston-Salem, NC 27103.

11. According to its website, novanthealth.org, Novant Health is a thriving integrated healthcare system of physician clinics, outpatient centers, and hospitals across two states, generating over $7.5 billion in revenue, with 2,100+ physicians, 19 medical centers, 900 locations, and a dedicated workforce of more than 43,000 team members.

12. Novant Health, Inc. serves as the parent system entity that holds The Presbyterian Hospital and Novant Health Matthews Medical Center, LLC, and other operating entities within its corporate family. The officers that make all decisions and operate the medical system sit at Novant Health, Inc., not at the individual hospital subsidiaries. The hospital system is managed and operated as one integrated company, and thus Novant Health, Inc. is liable for the actions of the medical centers within its system.

3

13. Defendant The Presbyterian Hospital, d/b/a Novant Health Presbyterian Medical Center ("Presbyterian"), is a North Carolina non-profit corporation with SOSID 0117860, with a principal place of business at 200 Hawthorne Lane, Charlotte, NC 28204.

14. Under The Presbyterian Hospital's name in the federal 340B Drug Pricing Program database, all of the authorizing officials are personnel of Novant Health, Inc.

15. Defendant Novant Health Matthews Medical Center, LLC, d/b/a Novant Health Matthews Medical Center, and formerly known as Presbyterian Medical Care Corp. ("NHMMC"), has SOSID 0117886 and a principal place of business at 2085 Frontis Plaza Boulevard, Winston-Salem, NC 27103.

16. Upon information and belief, Dr. Oliver W. Jervis, Jr., M.D., is a pulmonologist practicing in Charlotte, North Carolina, and is employed by and/or affiliated with multiple Novant Health facilities in the area, including Novant Health Presbyterian Medical Center and Novant Health Forsyth Medical Center. Dr. Jervis was the attending physician during Ms. Washington's hospital stay at Novant Health Presbyterian Medical Center.

17. At all relevant times, Dr. Jervis represented himself as working on behalf of Novant Health, and his services were rendered on behalf of Presbyterian.

18. Dr. Tom P. Theruvath, M.D., is a thoracic surgeon in Charlotte, North Carolina, and is employed by or affiliated with multiple hospitals in the area, including Novant Health Presbyterian Medical Center and Novant Health Huntersville Medical Center. He was the consulting physician during Ms. Washington's hospital stay and represented himself as a heart surgeon for Novant Health.

19. At all relevant times, Dr. Theruvath represented himself as working on behalf of Novant Health, and his services were rendered on behalf of the hospital.

## FACTUAL ALLEGATIONS

20. The paragraphs enumerated above and below are incorporated by reference.

4

21. Ms. Washington was taken by ambulance to Novant Health Matthews Medical Center on May 22, 2024, arriving at approximately 4:27 a.m. The ambulance was called because she had experienced a sudden, severe pain in her back and could not sit up. She asked to be taken to the hospital. In the ambulance, she suffered cardiac arrest; the EMTs revived her and transported her to Novant Health Matthews Medical Center. NHMMC performed a CT scan and rendered an initial diagnosis of a Type A Aortic Dissection.

22. At the time of arrival, Ms. Washington was unresponsive and did not appear conscious, but her treating physicians noted she was breathing on her own without mechanical assistance.

23. At approximately 6:37 a.m. on May 22, 2024, Dr. Margaret Hauck spoke with Ms. Washington's family and advised them that Ms. Washington required open-heart surgery to survive. Dr. Hauck stated that she did not know whether the cardiac surgeons would perform surgery on a patient who had suffered cardiac arrest and was not alert and awake, and therefore could not provide consent. Dr. Hauck asked whether Ms. Washington had ever expressed a wish not to receive medical intervention in a situation such as this. The family told Dr. Hauck that Ms. Washington had never expressed any such wish and had never declined emergency medical care.

24. Dr. Hauck noted that Ms. Washington had not required propofol to tolerate the breathing tube, which she described as a concerning sign of absent neurological activity, since a patient who is awake and alert on a ventilator ordinarily requires pain medication to endure it. Dr. Hauck acknowledged that this could occur after cardiac arrest, but stated it was a worrying indicator that Ms. Washington was not awake and fighting the breathing tube. Dr. Hauck further advised that if Ms. Washington were to undergo open-heart surgery, she would need to be transferred to Presbyterian Main.

25. At this time the family believed they saw neurological activity in Washington because her eyelids fluttered and she responded to touch.

26. The family requested the transfer, and Ms. Washington was transferred to Presby Main.

5

27. At approximately 10:00 a.m., Dr. Jervis entered Ms. Washington's room, accompanied by a woman, whom he described as a cardiac nurse. Dr. Jervis described Ms. Washington's condition as catastrophic and stated she could not survive without surgery. He noted that she was breathing on her own. He said the condition could not be managed with medication alone. He advised that the surgeons had reviewed her scans and determined they could not operate because she would not survive the procedure. He said there is no way she can survive this illness.

28. The family asked Dr. Jervis whether Ms. Washington would wake up. The cardiac nurse responded that she was not on any sedation. Dr. Jervis confirmed she was not sedated and stated that while he did not see evidence of a stroke, it was possible she had suffered one during the six minutes her heart had stopped. He said that, regardless, she was not awake, and that was simply the state she was in.

29. The family said this is the way she is now, but is it possible that she will wake up? Dr. Jervis said it is possible, but he doesn't know how likely that is.

30. The family asked how he knew and how often he had seen this happen. The cardiac nurse said they get a lot of aorta tears. The family asked again, "You get a lot of aorta dissections? I thought this was rare?" She said we do, recently we have, I have had a couple.

31. Dr. Jervis explained that there are two types of aortic tears: one occurring where the artery exits the heart (proximal), and one occurring further along (distal). He said that distal dissections carry a better prognosis and sometimes do not require surgery, with stenting as a possible option. He stated that in Ms. Washington's proximal case, medical therapy alone was not an option. The cardiac nurse then said Ms. Washington had the worst type of dissection. Dr. Jervis agreed.

32. The family then asked whether they were both cardiologists. Dr. Jervis clarified that he was a pulmonary care doctor and the woman was a cardiac nurse. He stated that the cardiothoracic surgeons would come to formally assess Ms. Washington, but that he had

6

already spoken with them by phone and believed the emergency room physician had as well.

33. The family asked whether anyone had evaluated Ms. Washington's brain. Dr. Jervis said they had and saw nothing of immediate concern, but acute neurological injuries often do not appear on imaging for several days.

34. Dr. Jervis further stated that Ms. Washington may have suffered mini-strokes, but that there was no bleeding and no obvious new stroke visible on the imaging performed. Ms. Washington's daughters stroked their mother's head and hair to comfort her and communicate their presence.

35. The family asked whether the machines were keeping Ms. Washington alive. Dr. Jervis confirmed they were, and that her blood pressure was being managed with medication. The family asked whether she could hear them. Dr. Jervis said he did not believe so.

36. One family member asked whether she was correct in that the ER had reported that Ms. Washington's eyes had opened. Another family member confirmed that her eyes had fluttered when they called her name, as if she were trying to open them. Dr. Jervis again stated he did not believe she could hear them.

37. The family asked whether the cardiothoracic surgeons were still coming to speak with them. Dr. Jervis confirmed they were, but stated that while this type of dissection would ordinarily call for emergent surgery, they would not operate due to the cardiac arrest and other factors. He acknowledged that this type of dissection is among the most serious and that surgery would be the correct intervention if it could be performed.

38. Dr. Jervis noted that many patients with an aortic dissection do not survive to reach a hospital. The family pointed out that Ms. Washington had been talking before the ambulance arrived. Dr. Jervis explained that she had developed a 6-centimeter hematoma. He described how blood from the heart enters an artery but, due to the tear, now flows through both the normal channel and a false lumen created by the dissection. He stated that

7

the resulting blood clot was compressing her pulmonary artery, impairing blood return to the lungs.

39. The family stated that no one had informed them of any risk of aortic dissection prior to this event. Dr. Jervis responded that by the time Ms. Washington experienced the back pain, the dissection had already occurred. The cardiac nurse then interjected that Ms. Washington's blood pressure had been fluctuating and mentioned that she had managed another patient with similar blood pressure issues that morning.

40. Dr. Jervis explained that blood vessels weaken with age. The family asked whether any test existed to assess the risk of this occurring. Dr. Jervis explained that some people develop aneurysms, which are weaknesses in the arterial wall without tearing, but that a dissection is a sudden event typically experienced as a tearing sensation in the back. He stated that Ms. Washington had likely been unable to describe what was happening at the time, and that she did not appear to be in discomfort at present. He said their focus now would be supporting her breathing and managing her blood pressure.

41. The family asked whether Ms. Washington would be in pain if she regained some level of consciousness. Dr. Jervis said yes, but noted that if the dissection was not actively extending, the pain would be less severe. He then asked whether she was a smoker. The family said she was not.

42. Dr. Jervis told the family that in all likelihood, Ms. Washington would be dead within 24 hours. The family was devastated. They asked whether something could be done for her lips.

43. The family gathered and began speaking to Ms. Washington about the people she would see in paradise. While the doctor and nurse were still present, Ms. Washington moved her leg. The cardiac nurse dismissed this as an involuntary reflex movement.

44. Ms. Washington regained consciousness and became alert. By 11:00 a.m., it was apparent to both the family and the nursing staff that Ms. Washington had awakened. She immediately began experiencing the full torment of her situation: the physical agony of the

8

intubation tube, the physical restraints binding her arms, and the freezing temperature of the room. Novant Health refused to administer any pain medication to alleviate the suffering caused by the intubation tube, stating that the doctors needed her to be alert in order to assess whether she was a surgical candidate. Novant Health also refused to administer any comfort medication, including Tylenol, for her documented fever, citing interference with neurological testing and her blood pressure condition. This was a surgical candidacy evaluation for a surgery that the medical team had already decided, in writing, it had no intention of offering her.

45. At approximately 12:00 to 1:00 p.m., Novant Health placed EEG cables on Ms. Washington's head and brought in camera and audio recording equipment to conduct the electroencephalogram study. Prior to the EEG cables being placed on Ms. Washington's head, her daughters had been stroking her head to comfort and calm her. Once Novant Health attached the EEG cables, the family was no longer able to comfort her in this way.

46. At approximately 3:30 p.m., Dr. Theruvath, the thoracic surgeon, came to speak with the family. His first question was whether Ms. Washington used a wheelchair. The family told him she walked on her own but used a walker or cane. The family asked about surgery, noting that their mother had awakened and was alert. Dr. Theruvath said surgery was not possible. He did not speak to the family about hospice care.

47. He falsely told the family that she had a Type B dissection, which was not the most severe classification, and that if her blood pressure could be maintained she might possibly live another two years. He noted she was breathing on her own. He did not examine Ms. Washington, did not attempt to speak with her, and did not perform any individualized assessment of her surgical candidacy. He looked only at the monitors.

48. He gave the family new hope, particularly in stating that the type of dissection was not the most severe and she could survive even without the surgery.

49. Unknown to the family at the time, Dr. Theruvath documented in Ms. Washington's medical records at pages 60-61 that there had never been any intention of operating on her

9

to save her life. He wrote, after she had already regained consciousness and become fully alert, that "she is 82 years old and was debilitated prior to dissecting her aorta, walking with a cane and walker thus she would not be a good candidate for surgical intervention even if she regains neurologic function." The decision to deny Ms. Washington surgery was made, and written into the permanent medical record, on the basis of her use of a mobility device, and not on any individualized surgical risk assessment, not on her acute clinical presentation, and not on any examination of Ms. Washington herself.

50. Every temperature reading taken at Ms. Washington's head showed no fever. However, a thermometer placed on the inside of her thighs registered low-grade fevers. To reduce that reading, nurses would remove her coverings. Ms. Washington shivered visibly from the cold. Her daughter initially feared she was having a seizure, then realized she was cold. The daughter asked Ms. Washington directly whether she was cold, and Ms. Washington nodded yes. Photographs taken during this period document the family's efforts to keep Ms. Washington warm using her own green robe and her daughter's grey hooded jacket, which were wrapped around her in the absence of the blanket that nurses had prohibited the family from using.

51. It was at this point that the family recognized that Ms. Washington was physically restrained, both arms bound to the bed frame, without justification from any previous attempts to fight or free herself, leaving her completely unable to move or call for help. Prior to this, the family thought Ms. Washington was strong enough to lift her arms off the bed as she wanted and was fighting to gain strength.

52. After the point of reaching full consciousness, the family began writing notes to their mom about the situation and asking for her wishes. Ms. Washington was continuously and visibly struggling to free herself and remove the tube from her throat, trying to speak and give her wishes. The family captured this on video. Novant Health refused to provide any medication to make her comfortable, citing the pending surgical evaluation as the reason.

This was a surgery the medical team had already determined in writing it had no intention of offering her.

53. Every treating physician had noted that Ms. Washington was breathing on her own without mechanical assistance. Springs repeatedly demanded that Novant Health remove the tube and was actively working to secure its removal from Ms. Washington's throat. This is documented in the medical records.

54. The evening CICU nurse said that only one person could stay overnight with Ms. Washington, so Foster left and Springs remained.

55. During the overnight hours between May 22 and May 23, 2024, Ms. Washington began making gagging sounds, as though choking on the tube. With both arms restrained, she could not reach the emergency help button or call out for help. Springs could not locate the nurse call button. Springs ran into the hallway and called for help. A nurse came and adjusted the tube in Ms. Washington's throat.

56. Springs asked where the emergency call button was. The nurse retrieved a call cord that had been hidden behind the machines on the wall behind the bed and handed it to Springs. The nurse then explained that the call buttons placed within reach of ICU patients would result in patients pressing them constantly and the staff would be unable to get anything done. Novant Health had thus made a deliberate institutional decision to leave restrained, voiceless patients without any means of summoning help.

57. That night was one of extreme suffering for Ms. Washington and for her daughter Springs, who kept vigil at her side. Ms. Washington was silently pleading to have the tube removed. The tube was secured with straps around her head and could not simply be pulled out. Attempting to remove it without first cutting or releasing the head straps would result in asphyxiation. Ms. Washington was trapped.

58. Ms. Washington was freezing because the nurse refused to allow her to be covered with the blanket.

11

59. Springs kept trying to get the nurses to get approval for the removal of the intubation. A nurse practitioner came in around midnight, and Springs asked him if he would remove the intubation. He did agree to remove the intubation but only if Springs signed a do not resuscitate waiver. He recommended waiting until the morning because overnight, the staff was low. Springs said it wasn't right to let her mother die just because she had refused one clearly unnecessary medical treatment.

60. The NP stated that Ms. Washington could be placed on a 30-minute spontaneous breathing trial, after which she could be transitioned to a CPAP machine. He called the respiratory technician to the room and directed her to conduct the 30-minute trial, and told Springs that if the results were satisfactory, the intubation would be removed. Springs also insisted that Ms. Washington needed medication to help her endure the intubation, as she was suffering terribly. The NP approved a dose of fentanyl. The fentanyl did not provide adequate relief, and Ms. Washington continued to struggle against the tube throughout the night.

61. The respiratory technician began the breathing trial but then failed to return to evaluate the results 30 minutes later so that the intubation could be removed. Springs had to locate the technician in the hospital hallway and beg her to come back nearly an hour and a half later. The technician then informed Springs that Ms. Washington could not be removed from the breathing trial until the doctors completed their rounds, directly contrary to what Springs had been told. Novant Health had thus misled Springs about the process and timeline for removing the tube.

62. The overnight CICU nurse never returned to her station after approximately 5:30 a.m., and when shifts changed, the incoming CICU nurse did not enter Ms. Washington's room.

63. At 7:30 a.m., Dr. Jervis entered Ms. Washington's room, accompanied by the cardiac nurse. The CICU nurse was also present at this time.

64. Despite Springs having repeatedly informed them that Ms. Washington could not hear without her hearing aids, Dr. Jervis and the cardiac nurse positioned themselves at the foot of the bed, which was the farthest point from her ears. Springs demanded that the tube be

12

removed from Ms. Washington. Dr. Jervis said he needed to assess whether she was responding to commands. The cardiac nurse stood at the foot of the bed and directed Ms. Washington to move her toes repeatedly.

65. After approximately ten minutes of pleading, Dr. Jervis agreed to remove the tube. At that moment, at approximately 7:49 a.m., Ms. Washington began gagging as though choking. Her pupils rolled upward into the top of her eye sockets. Springs called out to her mother repeatedly and cried to Dr. Jervis and the medical staff that something was wrong.

66. Dr. Jervis told Springs there was nothing wrong and that Ms. Washington was merely gagging because of the tube. He walked to the EEG monitor and stated he did not see any seizure activity. Springs was crying hysterically, begging the medical team to help her mother. Dr. Jervis did nothing.

67. It was the CICU nurse, not Dr. Jervis or the cardiac nurse, who moved to the cardiac monitor on the left side of Ms. Washington's bed and alerted Dr. Jervis that something was wrong: Ms. Washington's heart rhythm had become irregular, and her pulse was fading.

68. At 7:53 a.m., Dr. Jervis turned to Springs and asked whether she wanted Novant Health to attempt to save Ms. Washington. Springs, devastated that she was only now being asked, after the medical team had kept the tube in her mother's throat and refused to let her speak for nearly an entire day, said yes.

69. A resuscitation team entered the room and began manual CPR at approximately 7:55 a.m., without first removing the intubation tube or properly positioning a bag valve mask; the effort was visibly half-hearted. Dr. Jervis did not join the resuscitation effort. He positioned himself leaning against the table to the right of Ms. Washington's bed and scrolled on his phone while his patient was being resuscitated. (*See* **Exhibit A**) At one point, at least ten people were present in the room, yet at no time did more than two of them actively participate. One person performed chest compressions; a second person later relieved the first. At 7:58 a.m., Dr. Jervis directed them to stop. The CICU nurse's whiteboard notation

13

recorded the sequence: 7:53 — code; 7:56 — pulse PEA, epinephrine administered; 7:57 — epinephrine administered; 7:57 — pulse PEA; 7:58 — stop.

70. The medical records state that Dr. Jervis called the time of death at 8:09 a.m. That is the time also recorded on Ms. Washington's death certificate. However, the whiteboard notation by the CICU nurse, the video, and the contemporaneous timeline reflect that Dr. Jervis directed staff to stop resuscitation and called time of death at 7:58 a.m., eleven minutes earlier than what was entered into the official record. The recorded time of death in the medical records is inconsistent with the contemporaneous evidence of what occurred in the room.

71. After the resuscitation was stopped, Springs took a photograph of her deceased mother. One of the technicians, the same person who had performed the first chest compressions, told Springs that if she did not stop taking photographs of her own mother, she would call security and have Springs arrested. Neither Dr. Jervis nor any other physician or staff member present in the room corrected or rebuked the technician.

72. Springs told the technician that they had already taken everything from her, what more could they do. The technician said Springs ought to be grateful to her for trying to save her mother's life. Springs said that there were no posted signs prohibiting photography. The technician claimed that such signs were posted at the entrance when patients check in. Springs investigated and confirmed that no such signs existed.

73. Throughout the events described herein, Novant Health, Dr. Jervis, and Dr. Theruvath each acted in reckless disregard of Ms. Washington's health, safety, personal dignity, and rights. Their conduct was not the product of error or inadvertence, but rather it was systematic, documented, and deliberate. Plaintiffs will seek a jury instruction on reckless disregard, gross negligence, and malice.

74. Novant Health billed Medicare in excess of $30,000 for Ms. Washington's care. Included in that billing was $8,716 for an EEG ordered and conducted after Ms. Washington had already regained consciousness and become fully alert, and after Dr. Theruvath had already

14

written into the record that her use of a cane and walker meant surgery would never be offered regardless of any improvement in her neurological status. The EEG was billed to Medicare as a diagnostic procedure necessary to evaluate surgical candidacy. It was not. The records establish that surgical candidacy was never genuinely under consideration. Novant Health charged Medicare nearly nine thousand dollars for a test it knew served no therapeutic purpose for this patient.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

*(Disability Discrimination — Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 — Against Novant Health, Inc., The Presbyterian Hospital, and Novant Health Matthews Medical Center, LLC)*

75. The foregoing and following paragraphs are incorporated by reference.

76. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, provides that no otherwise qualified individual with a disability shall, solely by reason of her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

77. Upon information and belief, Defendants Novant Health, Inc., The Presbyterian Hospital, and Novant Health Matthews Medical Center, LLC each receive federal financial assistance within the meaning of Section 504, including reimbursement through the Medicare and Medicaid programs. Defendants billed Medicare in excess of $30,000 for services rendered to Ms. Washington, including over $8,700 for an EEG performed with no genuine intention of providing the surgical treatment that such testing was represented to evaluate.

78. Ms. Washington was an individual with a disability within the meaning of Section 504. She had a physical impairment—specifically, a mobility impairment requiring use of a

cane and walker—that substantially limited one or more major life activities, including but not limited to walking and caring for herself.

79. Ms. Washington was otherwise qualified to receive medical care and surgical evaluation from Defendants. She was a patient presenting with a diagnosed aortic dissection, a condition for which surgical intervention is an established and recognized course of treatment. Surgical candidacy is ordinarily determined through individualized clinical assessment; Defendants denied Ms. Washington any such individualized assessment and instead categorically excluded her from consideration based solely on her pre-existing disability.

80. Defendants excluded Ms. Washington from consideration for life-saving surgical repair and denied her the benefits of their federally assisted medical program solely by reason of her disability. Dr. Theruvath's own written records establish that the decision to foreclose surgical candidacy was explicitly and exclusively premised on Ms. Washington's use of a cane and walker and her "debilitated" pre-existing condition—not on any individualized surgical risk analysis or on her acute medical presentation. This constitutes intentional discrimination within the meaning of Section 504.

81. Defendants additionally denied Ms. Washington the benefits of their program by withholding pain management and comfort care while she was awake and suffering, physically restraining her while conscious, and deceiving her family regarding the true purpose of diagnostic testing. These acts treated Ms. Washington less favorably than non-disabled patients on account of her disability.

82. As a direct and proximate result of Defendants' violations of Section 504, Ms. Washington was denied life-saving medical treatment, was caused to endure prolonged physical pain and suffering while conscious, and died. Plaintiffs are entitled to compensatory damages, including economic and pecuniary damages and, to the extent permitted post-Cummings v. Premier Rehab Keller, P.L.L.C., 596 U.S. 212 (2022), physical pain and suffering damages arising from bodily injury directly caused by the discrimination, which remain a

16

contested but recognized category in several post-Cummings courts as distinct from purely emotional harm. Plaintiffs are further entitled to injunctive relief, attorneys' fees, and costs pursuant to 29 U.S.C. § 794a.

**SECOND CLAIM FOR RELIEF**

*(Disability Discrimination — Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 — Against Novant Health, Inc., The Presbyterian Hospital, and Novant Health Matthews Medical Center, LLC)*

83. The foregoing and following paragraphs are incorporated by reference.

84. Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, prohibits discrimination on the basis of disability in any health program or activity, any part of which receives federal financial assistance. Section 1557 incorporates the nondiscrimination standards of Section 504 of the Rehabilitation Act and extends those protections specifically to covered health programs and activities.

85. Defendants operate health programs and activities within the meaning of 42 U.S.C. § 18116, including but not limited to Novant Health Matthews Medical Center and The Presbyterian Hospital. Each such program or activity receives federal financial assistance, including Medicare and Medicaid reimbursements. Defendants are therefore subject to the nondiscrimination requirements of Section 1557.

86. Ms. Washington was a person with a disability within the meaning of Section 1557 in that she had a physical impairment—specifically, mobility limitations requiring use of a cane and walker—that substantially limited one or more major life activities.

87. Defendants discriminated against Ms. Washington on the basis of her disability in the provision of health care services by categorically excluding her from surgical evaluation and treatment based on her pre-existing mobility impairment. The medical record created by Dr. Theruvath demonstrates that the operative basis for this exclusion was Ms. Washington's use of a cane and walker and her characterization as "debilitated"—not any

17

individualized assessment of her capacity to benefit from surgical intervention. This constitutes discrimination in a health program on the basis of disability in violation of 42 U.S.C. § 18116.

88. Defendants further violated Section 1557 by performing and billing Medicare for diagnostic procedures, including an EEG billed at over $8,700, that served no genuine therapeutic purpose given that Defendants had predetermined—based solely on Ms. Washington's disability—that she was not a candidate for the surgical treatment those tests were ostensibly evaluating her for. This conduct constitutes a denial of meaningful access to health care services on the basis of disability and a deprivation of the equal opportunity to benefit from Defendants' health programs.

89. Defendants also failed to provide Ms. Washington with equal access to pain management, comfort care, and the ability to communicate her treatment preferences while she was awake and alert, withholding these services in a manner that treated her less favorably than non-disabled patients would have been treated in comparable circumstances, in further violation of Section 1557.

90. As a direct and proximate result of Defendants' violations of Section 1557 of the Affordable Care Act, Ms. Washington was denied life-saving medical care, was caused to endure prolonged physical pain and suffering while conscious, and died. Plaintiffs are entitled to compensatory damages, including economic and pecuniary damages and, to the extent permitted post-Cummings v. Premier Rehab Keller, P.L.L.C., 596 U.S. 212 (2022), physical pain and suffering damages arising from bodily injury directly caused by the discrimination, which remain a contested but recognized category in several post-Cummings courts as distinct from purely emotional harm. Plaintiffs are further entitled to injunctive relief, attorneys' fees, and costs as authorized by 42 U.S.C. § 18116 and applicable regulations.

## THIRD CLAIM FOR RELIEF

*(Civil Assault and Battery — All Defendants)*

91. The foregoing and following paragraphs are incorporated by reference.

92. Under North Carolina law, a medical provider commits battery by performing a procedure without the patient's consent or exceeding the scope of consent given.

93. Ms. Washington did not provide consent to intubation.

94. Ms. Washington was breathing on her own. Ms. Washington made known the lack of consent the only way she could, without being able to speak and her arms tied down. At the time she regained consciousness, Ms. Washington expressed clearly her lack of consent through her actions, including attempts to remove the tube and visible distress.

95. Plaintiffs and Ms. Washington's authorized decision-makers repeatedly communicated that the intubation should be removed.

96. Defendants intentionally continued the intubation and physically restrained Ms. Washington to prevent her from withdrawing consent.

97. Defendants further refused to provide adequate pain management or sedation, thereby forcing Ms. Washington to endure the procedure against her will.

98. The continued intubation under these circumstances constituted an intentional, unauthorized touching of Ms. Washington's person.

99. As a direct and proximate result, Ms. Washington suffered physical injury, extreme pain, emotional distress, and violation of her bodily autonomy and dignity.

100. Defendants' conduct was willful, malicious, and in reckless disregard of Ms. Washington's rights, entitling Plaintiffs to punitive damages.

## FOURTH CLAIM FOR RELIEF

*(False Imprisonment — All Defendants)*

101. The foregoing and following paragraphs are incorporated by reference.

19

102. False imprisonment is the unlawful restraint of a person against her will without legal justification.

103. Ms. Washington was not under arrest, was not a detainee, and was not in the custody of any law enforcement authority.

104. Accordingly, there existed no custodial or security-based justification for restraining her.

105. The only possible justification for restraint would be medical necessity. No such necessity existed.

106. Defendants intentionally restrained Ms. Washington by physically binding her arms to the hospital bed.

107. Ms. Washington was conscious, aware, and actively attempting to move and free herself.

108. Ms. Washington did not consent to such restraint.

109. Defendants lacked lawful justification for continued restraint, particularly after Ms. Washington regained consciousness and was not posing a threat warranting such extreme measures without appropriate safeguards or consent.

110. Defendants further deprived Ms. Washington of any reasonable means of escape or communication, including placing the nurse call button out of reach and effectively isolating her. Ms. Washington was physically tied to the hospital bed. She could not move or even access the emergency help button.

111. As a result, Ms. Washington was confined against her will and unable to summon help while in distress.

112. The continued restraint of Ms. Washington, a non-custodial patient, while conscious, suffering, and unable to free herself, far exceeds any permissible use of restraint under accepted standards. Courts have consistently found that restraining an individual who is incapacitated, not dangerous, or in need of medical care—without individualized justification—constitutes unlawful conduct. See, e.g., Robles v. Prince George's County, 302 F.3d 262 (4th Cir. 2002).

113. This confinement caused Ms. Washington severe physical discomfort, panic, emotional distress, and humiliation.

114. Defendants' conduct was intentional, willful, and in reckless disregard of Ms. Washington's rights, entitling Plaintiffs to compensatory and punitive damages.

## FIFTH CLAIM FOR RELIEF

*(N.C. Gen. Stat. § 75-1.1 — Unfair and Deceptive Trade Practices Act — All Defendants)*

115. Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

116. Pursuant to N.C. Gen. Stat. § 14-112.2 (Exploitation of an older adult or disabled adult), Ms. Washington was an older adult and a disabled adult.

117. Under subpart (b), it is unlawful for a person: (i) who stands in a position of trust and confidence with an older adult or disabled adult, or (ii) who has a business relationship with an older adult or disabled adult to knowingly, by deception or intimidation, obtain or use, or endeavor to obtain or use, an older adult's property with the intent to temporarily benefit someone other than the older adult or disabled adult.

118. At all relevant times, Defendants were engaged in commerce within the meaning of N.C. Gen. Stat. § 75-1.1, including the provision, marketing, and billing of medical services and related healthcare transactions.

119. Defendants, acting individually and in concert, engaged in unfair and deceptive acts and practices in or affecting commerce, including but not limited to misrepresenting the nature, purpose, and necessity of medical testing and treatment provided to Washington.

120. Specifically, Defendants represented to the family that certain diagnostic procedures, including but not limited to neurological testing, were necessary to evaluate her candidacy for cardiac surgery, when in fact Defendants knew or had reason to know that she was not a candidate for such surgery and that no such surgical intervention was intended.

21

121. Defendants performed and billed for such procedures despite lacking any genuine intent to provide the represented course of treatment, and did so for the purpose of generating revenue through Medicare and/or patient financial responsibility.

122. Upon information and belief, Defendants' conduct was part of a pattern or practice of obtaining payment for services that were not medically necessary or were misrepresented in purpose.

123. Defendants' actions were unethical, unscrupulous, and substantially injurious to Washington, and constitute unfair and deceptive acts or practices within the meaning of § 75-1.1.

124. The foregoing conduct further constitutes exploitation of an older or disabled adult as defined by N.C. Gen. Stat. § 14-112.2, in that Defendants knowingly obtained or used the resources of Washington, a vulnerable adult, through deception and undue influence for their own benefit.

125. Defendants' violation of § 14-112.2 evidences and supports the unfairness and deception of their conduct under § 75-1.1.

126. As a direct and proximate result of Defendants' unfair and deceptive acts, Washington suffered actual injury, including but not limited to financial loss, liability for medical charges, and other economic damages.

127. Defendants' conduct was willful, and Defendants engaged in such conduct with knowledge of its deceptive nature and with reckless disregard for the rights of Washington.

128. Defendants have refused to resolve this matter despite receipt of a notice of their misconduct, including a demand letter and a draft complaint, more than thirty days before the filing of this complaint.

129. Plaintiffs are entitled to have actual damages trebled pursuant to N.C. Gen. Stat. § 75-16, reasonable attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1, and costs of this action.

**SIXTH CLAIM FOR RELIEF**

22

*(Intentional Infliction of Emotional Distress — All Defendants)*

130. The foregoing and following paragraphs are incorporated by reference.

131. To prevail on a claim for intentional infliction of emotional distress under North Carolina law, a plaintiff must establish: (1) extreme and outrageous conduct by the defendant; (2) which is intended to cause, and does cause, severe emotional distress, or which the defendant knows or should know will cause severe emotional distress; and (3) that the conduct in fact causes the plaintiff severe emotional distress. Dickens v. Puryear, 302 N.C. 437 (1981). North Carolina recognizes IIED claims by bystanders who are present and closely related to the direct victim. Plaintiffs bring this claim on behalf of the Estate of Ms. Washington for her own pre-death suffering, and individually on behalf of Venus Springs and Tammy Foster.

132. Defendants' conduct toward Ms. Washington was extreme and outrageous in the highest degree. While Ms. Washington was conscious, alert, and fully aware of her circumstances, Defendants: physically restrained both of her arms to the bed frame so that she could not move or call for help; forced her to remain intubated against her will and the repeated objection of her family; refused to administer pain medication or any comfort measures while she was awake and suffering; deliberately exposed her to freezing temperatures by prohibiting her family from covering her with a blanket, in the purported name of fever management, while she shivered uncontrollably; hid the emergency nurse call button behind machines and out of her reach; performed diagnostic testing they knew was purposeless given that they had already decided her disability disqualified her from surgery; and failed to render meaningful resuscitative aid at the time of her death while the attending physician scrolled on his phone. This conduct was not merely negligent or insensitive—it was deliberate, prolonged, and inflicted upon a conscious, disabled, elderly patient who could neither speak nor free herself.

23

133. Claim on Behalf of the Estate of Barbara Washington. Ms. Washington experienced the full weight of Defendants' extreme and outrageous conduct while conscious and aware. The Estate is entitled to recover for Ms. Washington's severe pre-death emotional distress, mental anguish, and physical suffering proximately caused by Defendants' intentional and outrageous conduct.

134. Claim on Behalf of Tammy Foster. Tammy Foster, the daughter of Ms. Washington, was present and personally witnessed Defendants' extreme and outrageous conduct, including the civil battery inflicted upon her mother through forcible intubation and maintenance of the tube against her will; her mother's physical restraint with both arms bound to the bed frame; her mother's visible shivering and suffering from deliberate exposure to freezing temperatures while hospital staff refused to permit any covering; and her mother's repeated and futile attempts to pull free from her restraints. As a direct and proximate result, Foster suffered and continues to suffer severe emotional distress, grief, and mental anguish.

135. Claim on Behalf of Venus Springs. Venus Springs, the daughter of Ms. Washington and the Executrix of her Estate, remained at her mother's side throughout the overnight hours and the morning of her death. Springs witnessed the civil battery, the physical restraints, the freezing conditions, the hidden call button, the overnight ordeal of choking and gagging, the failure to render meaningful resuscitative aid as her mother died, and, immediately following her mother's death, a hospital technician threatening Springs with arrest by security for taking a photograph of her own deceased mother, a threat that was not corrected by any physician or hospital staff present in the room. As a direct and proximate result, Springs suffered and continues to suffer severe emotional distress, grief, trauma, and mental anguish. Springs lost significant weight, has been diagnosed with PTSD, and takes medication to deal with her continuing distress.

136. Defendants' conduct exceeded all reasonable bounds of decency. Defendants are liable to the Estate and to Springs and Foster for compensatory and punitive damages for their intentional and outrageous misconduct.

24

## SEVENTH CLAIM FOR RELIEF

*(Negligent Infliction of Emotional Distress — In the Alternative — All Defendants)*

137. The foregoing and following paragraphs are incorporated by reference.

138. Plaintiffs bring this claim in the alternative pursuant to Rule 8(d) of the Federal Rules of Civil Procedure. To prevail on a claim for negligent infliction of emotional distress under North Carolina law, a plaintiff must establish: (1) that the defendant negligently engaged in conduct; (2) that it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress; and (3) that the conduct in fact caused the plaintiff severe emotional distress. Johnson v. Ruark Obstetrics, 327 N.C. 283 (1990). Plaintiffs bring this claim on behalf of the Estate of Ms. Washington for her own pre-death suffering, and individually on behalf of Venus Springs and Tammy Foster.

139. Defendants negligently engaged in conduct including failing to administer pain medication or comfort measures to a conscious, intubated patient; failing to maintain adequate body temperature for a restrained patient unable to seek warmth herself; failing to place the emergency call button within reach of a restrained patient; failing to render timely and adequate aid in response to Ms. Washington's acute deterioration and death; performing diagnostic testing for a surgical candidacy evaluation that had no genuine purpose; and failing to obtain or honor Ms. Washington's informed consent.

140. It was reasonably foreseeable that each of these failures, occurring in the presence of Ms. Washington's family members, would cause those family members severe emotional distress. Defendants are liable to the Estate of Barbara Washington, Venus Springs, and Tammy Foster for compensatory damages, including damages for severe emotional distress and suffering, proximately caused by Defendants' negligent acts and omissions.

## EIGHTH CLAIM FOR RELIEF

25

*(Medical Malpractice — Failure to Provide Life-Saving Surgical Treatment — Against Dr. Theruvath, Dr. Jervis, Presbyterian, and Novant Health, Inc.)*

141. The foregoing and following paragraphs are incorporated by reference.

142. At all relevant times, Defendants owed Ms. Washington a duty to provide medical care in accordance with the applicable standard of practice among members of the same health care profession with similar training and experience situated in the same or similar communities.

143. Ms. Washington was diagnosed with a life-threatening aortic dissection, a condition for which emergent surgical repair is a recognized and, in many cases, necessary life-saving intervention.

144. Defendants, including but not limited to Dr. Theruvath and Dr. Jervis, failed to provide Ms. Washington with an individualized assessment of her candidacy for surgical intervention and instead categorically denied her surgery.

145. Upon information and belief, Defendants made a predetermined decision not to offer surgical repair based on improper considerations, including Ms. Washington's age and alleged pre-existing mobility limitations characterized as a "debilitated" status, rather than a good-faith, individualized medical judgment.

146. Defendants represented to Plaintiffs that surgical intervention would be evaluated and that diagnostic testing, including neurological testing, was necessary to determine candidacy, when in fact Defendants had already determined that surgery would not be offered under any circumstances.

147. Defendants' failure to timely evaluate, recommend, and perform life-saving surgical repair fell below the applicable standard of care.

148. As a direct and proximate result of Defendants' deviation from the standard of care, Ms. Washington was denied the opportunity for life-saving treatment and suffered conscious pain and suffering and death.

26

149. Pursuant to N.C. Gen. Stat. § 90-21.19(b), Plaintiffs are entitled to recover noneconomic damages without statutory cap because Washington died due to the grossly negligent, intentional, and/or fraudulent acts of the Defendants, and such acts were in reckless disregard for her rights.

150. As a direct and proximate result of Defendants' negligence, Plaintiffs are entitled to recover compensatory damages, including damages for pain and suffering, emotional distress, and wrongful death, as well as punitive damages due to Defendants' willful and wanton conduct.

## NINTH CLAIM FOR RELIEF

*(Medical Malpractice — Failure to Render Aid and Abandonment During Medical Distress — Against Dr. Jervis, Presbyterian, and Novant Health, Inc.)*

151. The foregoing and following paragraphs are incorporated by reference.

152. Defendants owed Ms. Washington a continuous duty to monitor, assess, and respond to her medical condition, including emergent distress and cardiopulmonary compromise.

153. On the morning of May 23, 2024, Ms. Washington exhibited clear signs of acute medical distress, including gagging, abnormal pupil response, and loss of pulse.

154. Despite these obvious signs of impending cardiopulmonary arrest, Defendant Dr. Jervis failed to timely assess, diagnose, or intervene.

155. Instead of rendering immediate life-saving care, Dr. Jervis dismissed Ms. Washington's condition, failed to initiate appropriate emergency protocols, and delayed necessary intervention.

156. When Ms. Washington entered cardiac arrest, Defendants failed to provide adequate and timely resuscitative efforts consistent with the applicable standard of care.

157. Dr. Jervis failed to personally render meaningful aid, failed to lead or properly direct resuscitation efforts, and instead disengaged from patient care, including using his

27

cellphone while leaning against a table while Ms. Washington was in extremis. This complete lack of care is captured in images and video retained by the family.

158. Resuscitative efforts were prematurely terminated without exhausting appropriate life-saving measures.

159. Defendants' conduct constitutes medical abandonment, failure to render aid, and gross deviation from accepted medical standards.

160. As a direct and proximate result of Defendants' failure to render aid, Ms. Washington suffered conscious pain and suffering and death.

161. Pursuant to N.C. Gen. Stat. § 90-21.19(b), Plaintiffs are entitled to recover noneconomic damages without statutory cap because Washington died due to the grossly negligent, intentional, and/or fraudulent acts of the Defendants, and such acts were in reckless disregard for her rights.

162. Defendants' conduct was willful, wanton, and in reckless disregard of Ms. Washington's life and safety, entitling Plaintiffs to punitive damages.

## TENTH CLAIM FOR RELIEF

*(Wrongful Death — N.C. Gen. Stat. § 28A-18-2 — All Defendants)*

163. The foregoing and following paragraphs are incorporated by reference.

164. This is a wrongful death action brought pursuant to N.C. Gen. Stat. § 28A-18-2 by the duly appointed Executrix of the Estate of Barbara Washington for the benefit of the statutory beneficiaries.

165. At all relevant times, Defendants owed Ms. Washington a duty to exercise reasonable care in the provision of medical treatment and to act in accordance with the applicable standard of care.

166. Defendants breached their duties to Ms. Washington through negligent, reckless, and intentional acts and omissions, including failing to provide or meaningfully consider life-saving surgical intervention for Ms. Washington's aortic dissection; failing to perform an

28

individualized assessment of her surgical candidacy; withholding appropriate medical treatment, including pain management and comfort care; failing to timely recognize and respond to Ms. Washington's medical distress; failing to render appropriate and timely life-saving aid when Ms. Washington was in extremis; providing inadequate, delayed, and prematurely terminated resuscitative efforts; and otherwise failing to act in accordance with the applicable standard of care.

167. Defendants' acts and omissions, as described herein, constitute negligence, gross negligence, and willful and wanton conduct.

168. As a direct and proximate result of Defendants' wrongful acts and omissions, Ms. Washington suffered conscious pain and suffering and ultimately died.

169. Pursuant to N.C. Gen. Stat. § 28A-18-2, Plaintiffs are entitled to recover damages, including expenses for care, treatment, and hospitalization incident to the injury resulting in death; compensation for Ms. Washington's conscious pain and suffering; reasonable funeral expenses; the present monetary value of Ms. Washington to her beneficiaries, including but not limited to loss of services, protection, care, assistance, society, companionship, comfort, guidance, kindly offices, and advice; and punitive damages as allowed by law for Defendants' willful, wanton, and reckless conduct.

170. Plaintiffs demand judgment against Defendants jointly and severally for all damages recoverable under North Carolina's wrongful death statute, together with costs, interest, and such other relief as the Court deems just and proper.

## JUSTIFICATION FOR PUNITIVE DAMAGES

*(N.C. Gen. Stat. § 1D-1 et seq.)*

171. Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

172. At all relevant times, Defendants' conduct was accompanied by aggravating factors, including fraud, malice, and willful or wanton conduct as defined by N.C. Gen. Stat. § 1D-5.

173. Defendants' actions were willful and wanton in that they demonstrated a conscious and intentional disregard of, and indifference to, the rights and safety of Ms. Washington, which Defendants knew or should have known was reasonably likely to result in injury or death.

174. Defendants knowingly and intentionally denied Ms. Washington access to life-saving surgical treatment without conducting a good-faith, individualized medical assessment, and instead relied on improper and discriminatory considerations, including her age and disability.

175. Defendants knowingly subjected Ms. Washington to prolonged, conscious suffering by maintaining intubation against her expressed wishes and without adequate sedation or pain control; physically restraining her while she was awake and in distress; and withholding basic comfort measures despite clear evidence of suffering.

176. Defendants charged Washington and billed Medicare for testing evaluating Washington's suitability for a surgery that the medical records show they never intended to authorize.

177. Defendants further acted with willful and wanton disregard for Ms. Washington's life by failing to respond appropriately when she exhibited clear signs of medical distress and impending cardiac arrest.

178. Defendants' actions were not the result of mere negligence but were part of a pattern of reckless indifference to Ms. Washington's rights, dignity, and life.

179. The acts and omissions of Defendants were willful, wanton, malicious, and in reckless disregard of Ms. Washington's rights and safety, thereby justifying the imposition of punitive damages pursuant to N.C. Gen. Stat. § 1D-15.

180. Defendants are liable for punitive damages in an amount sufficient to punish Defendants and deter similar conduct in the future.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants and in favor of Plaintiffs and award the following relief:

A.      A declaration that Defendants' actions constituted reckless disregard of the Plaintiffs' rights, were grossly negligent, and/or were intentional, and violated Section 504 of the Rehabilitation Act and Section 1557 of the Affordable Care Act;

B.      Compensatory, consequential, general, and special damages in an amount to be determined at trial;

C.      Trebling of damages under N.C. Gen. Stat. § 75-16, or punitive damages in the alternative, as proven at trial, plus interest;

D.      Reasonable attorneys' fees pursuant to 29 U.S.C. § 794a, 42 U.S.C. § 18116, and N.C. Gen. Stat. § 75-16.1;

E.      Injunctive relief enjoining Defendants from further discriminatory conduct as authorized by 29 U.S.C. § 794a and 42 U.S.C. § 18116;

F.      Costs and disbursements of the action;

G.      Pre- and post-judgment interest; and

H.      Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution, Plaintiffs hereby demand a trial by jury on all claims and issues so triable.


Dated: May 26, 2026
Respectfully submitted,

/s/ V. Yvette Springs
V. Yvette Springs

31

North Carolina State Bar No. 28809
SPRINGS LAW FIRM PLLC
1235 East Blvd, Suite E, PMB 483
Charlotte, NC 28203
Telephone: (704) 241-9995
Email: vsprings@springslawfirm.com
Attorney for Plaintiffs

32

**VERIFICATION**

I, Venus Springs, in my capacity as Executrix of the Estate of Barbara Washington, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Complaint and that the matters and things stated therein are true of my own personal knowledge, except as to those matters stated upon information and belief, and as to those matters, I believe them to be true.

Executed on the 26th day of May, 2026, at Mecklenburg County, North Carolina.

_____
Venus Springs, as Executrix
The Estate of Barbara Washington